# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOEL FAZZIO** | **CIVIL ACTION** |
| **VERSUS** | **NO: 07-3514-SS** |
| **JESSICA TOLL, et al** | |

## ORDER

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Rec. doc. 49)

**GRANTED**

Before the undersigned is the motion of the defendant, KMGP Services Company, Inc. ("KPMG"), for summary judgment. Rec. doc. 49. The parties consented to proceed before the undersigned. Rec. doc. 20. For the reasons described below the motion will be granted and the federal and state age discrimination claims of the plaintiff, Joel Fazzio ("Fazzio"), will be dismissed with prejudice.

## PROCEDURAL BACKGROUND

On June 27, 2008, Fazio filed a complaint against his former employer, KMGP, and Jessica Toll. Rec. doc. 1. He alleged that he was terminated on account of his age. All claims asserted by Fazzio except for his claims of age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1) ("ADEA"), and La. R.S. 23:311 were previously dismissed with prejudice. Rec. doc. 29. The claims against Toll were dismissed because she was never served with the summons and complaint. Rec. doc. 48. On September 30, 2008, KMGP filed its motion for summary judgment which was briefed by the parties. Rec. docs. 49, 52 and 55.

FACTUAL BACKGROUND

In making a summary judgment determination, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." Evans v. City of Bishop, 238 F.3d 586, 589 (5th Cir.2000).  Based on this standard, the factual background of this lawsuit is as follows:

From 1976 to 1999, Fazzio was employed by International Matex Tank Terminals, Inc. ("IMTT") in New Orleans.  From 1992 to 1999, he was an environmental compliance officer.  Rec. doc. 49 (Exhibit 1 to Exhibit G).  In 1999, when he was 56, he took early retirement from IMTT. Rec. doc. 49 (Exhibit G at 7 and 12)

In 1999, he began employment with Delta Terminal Services, LLC ("Delta").  Rec. doc. 49 (Exhibit 1 to Exhibit G).  Kinder Morgan, Inc. ("Kinder Morgan") acquired Delta in 2001 and retained Fazzio.  At that time he was 58.  Rec. doc. 49 (Exhibit G at 7 and 12).

On October 2, 2005, when he was nearly 63, Fazzio was made a project manager for environmental, health and safety for the terminal facilities at Harvey and St. Gabriel, Louisiana. Rec. doc. 49 (Exhibit G at 106-07 and Exhibit 1 to Exhibit G).  These facilities engaged in the transfer (marine, truck and rail) and storage of multiple bulk liquids including chemicals, petroleum, vegetable oils and animal fats.  Rec. doc. 49 (Exhibit 1 to Exhibit G).

Fazzio was responsible for managing the air quality projects at the Harvey and St. Gabriel terminal facilities for compliance with air quality compliance with regulations issued by the Louisiana Department of Environmental Quality ("DEQ").  Rec. doc. 49 (Exhibit G at 108).  He calculated, managed and reported air emissions to DEQ, rec. doc. 49 (Exhibit G at 109), calculated emissions for DEQ permits for storage tanks, rec. doc. 49 (Exhibit G at 75), and his responsibilities

2

included applications, modifications, temporary variances and renewals for air permits from DEQ. Rec. doc. 49 (Exhibit G at 109-10 and 191).  Until March 2006, his performance evaluations were good.  Rec. doc. 49 at 13, n. 8.

In 2006, KMPG hired ENVIRON to assist it with an environmental compliance audit including air emission records and practices at its facilities.  Rec. doc. 49 (Exhibit A at para. 4).  The audit was company wide with the Harvey terminal selected as the first facility to be examined.  Rec. doc. 49 (Exhibit A at para. 4).  The audit at the Harvey terminal was conducted in March 2006, rec. doc. 49 (Exhibit G at 159) and concluded that: (1) air emissions at the terminal were under reported to DEQ; (2) several required permits had lapsed; and (3) the 2000-1 storage tank was improperly operated and maintained.  Rec. doc. 49 (Exhibit A at para. 4).  Jessica Toll, assistant general counsel for KMPG, was on the audit team.  Rec. doc. 49 (Exhibit E at para. 3).

1.    The air emissions calculations.

Prior to the audit, Fazzio used the "AP 42 methodology" to calculate air emissions.  Rec. doc. 49 (Exhibit G at 160-61).  The audit concluded that the "Ferry methodology" should have been used to calculate air emissions.  Rec. doc. 49 (Exhibit A at para. 4).  The Ferry methodology was more conservative than the AP 42 methodology as the Ferry methodology overestimates air emissions in order to ensure compliance with regulations.  Rec. doc. 49 (Exhibit D at para. 5 and Exhibit G at 162).

Fazzio believed that the Ferry methodology overstated emissions and grossly overestimated storage tank loss.  (Exhibit G at 160-62).  Either during the March 2006 audit or after the audit, Toll instructed Fazzio to use the Ferry methodology for air emission calculations.  Rec. doc. 49 (Exhibit E at para. 4 and Exhibit G at 159).

Fazzio understood that KMPG mandated the use of the Ferry methodology on a company wide basis.  Rec. doc. 49 (Exhibit G at 163, 166 and 168).  He believed that this decision was not necessarily correct.  Rec. doc. 49 (Exhibit G at 167).  He was opposed to the use of the new calculation method and resisted the change to the Ferry methodology.  Rec. doc. 49 (Exhibit G at 160 and 163).  He left a voice mail for Toll, in which he indicated that he was going to continue using the AP-42 calculation rather than the Ferry methodology unless she told him otherwise.  Rec. doc. 49 (Exhibit G at 164).  He denied using the AP-42 calculation after Toll instructed him to use the Ferry methodology.  Rec. doc. 49 (Exhibit G at 168).  After the audit Fazzio was required to submit all reports generated by him to Toll for review before they were submitted to DEQ.  Rec. doc. 49 (Exhibit A at para 5 and Exhibit G at 199).

2.     The temporary (variance) permit for Tank 2000-1.

The marketing department for the Harvey terminal determined to store natural gasoline in Tank 2000-1 for a temporary period and a temporary or variance permit was secured from DEQ for the storage of natural gas in Tank 2000-1.  Rec. doc. 49 (Exhibit 1 to Exhibit E, and Exhibit G at 74).  The temporary permit expired, rec. doc. 49 (Exhibit G at 191), and natural gasoline was stored in Tank 2000-1 for an extended period beyond the expiration of the temporary permit.  Rec. doc. 49 (Exhibit G at 74).  During the March 2006 audit, KMPG learned of the storage and that the variance permit had expired.  Rec. doc. 49 (Exhibit G at 192).

Fazzio reported that the natural gas was stored in Tank 2000-1 for an extended period of time without his knowledge. Rec. doc. 49 (Exhibit G at 74).  He denied that it was his responsibility to monitor the products in the storage tanks.  Rec. doc. 49 (Exhibit G at 74).  He denied that it was his responsibility to make sure that the variance permit did not expire without either a renewal or change

4

of tank service permit.  Rec. doc. 49 (Exhibit G at 192).  Despite his denial, he understood that KMPG considered it his responsibility to maintain the variance permit.  Rec. doc. 53 (Exhibit 5 at 193-94).

3.    Roof landings for tanks.

Noelle Strid, a manager of environmental health and safety for KMPG, explained the issue of roof landings for tanks.

> To suppress emissions in tanks containing high vapor material, such as natural gas, a floating roof is installed on top of the liquid in the tank.  The roof has legs.  When the tank is full or marginally full, the floating roof rests directly on top of the material, minimizing vapor creation.  However, when the material is low in the tank, the legs rest and vapor space is created.  In this situation, as long as the roof is not allowed to land, the vapor space is maintained, and the vapor is prevented from escaping.  But if the roof is allowed to land, the control mechanism of the floating roof is lost, and the vapors escape rapidly when the tank is refilled.

Rec. doc. 49 (Exhibit D at 2-3).

On April 13, 2006, Toll sent an e-mail to Fazzio that Tank 2000-1 could not be landed because of the landing loss emissions.  Fazzio was instructed to work with other persons and Environ to work for a long term strategy for Tank 2000-1.  Rec. doc. 49 (Exhibit 1 to Exhibit E) and Rec. doc. 53 (Exhibit 5 at 196-97).  The roof for Tank 2000-1 landed.  Rec. doc. 53 (Exhibit 5 at 196).  Fazzio contended it was out of his control.  Rec. doc. 49 (Exhibit G at 197).

4.    Fazzio's termination.

Brian Seaman, the regional director of environmental health and safety for KMPG, requested that Fazzio be terminated.  Rec. doc. 49 (Exhibit A at para. 6).  John Dalton, regional director of human resources for KMPG, was told to conduct an investigation into Seaman's request.  Rec. doc. 49 (Exhibit F at paras. 1-2).  Dalton interviewed Seaman, Toll and Bob Sullivan, an environmental engineer for KMPG.  At the time of the investigation, Dalton was 60.  Rec. doc. 49 (Exhibit F at

para. 3).  After completing the investigation, Dalton recommended that Fazzio be terminated.  Rec.

doc. 49 (Exhibit F at para. 8).

On June 29, 2008, Sherman presented Fazzio with a corrective action report and terminated

him.  Rec. doc. 49 (Exhibit A at para. 7).  The report included the following statement:

> Considering your resistance to changing emission calculation and reporting, your
> lack of follow-up action to insure that the floating roof was not allowed to land, your
> denial of oral and written communications dealing with the floating tank roof, the
> necessity to deny you the ability to submit air emission reports without review and
> clearance by others, and that you no longer have necessary credibility within our
> organization, we have determined to terminate your employment effective
> immediately.

Rec. doc. 49 (Exhibit 1 to Exhibit A).

After his termination, Fazzio sent a letter to Ellen Graffeo, human resources manager for

KMPG, contesting the termination.  Rec. doc. 49 (Exhibit I at paras. 2 and 4).  The letter indicated

that Fazzio believed his termination was an abuse of authority, but it did not specifically mention

that he believed his age had anything to do with it.  Rec. doc. 49 ( Exhibit 1 to Exhibit I).  Graffeo

conducted an investigation, which included communications with Seaman, Fazzio, Toll and Scott

Kilkenny, the vice-president for environmental health and safety for KMPG and Seaman's superior.

Rec. doc. 49 (Exhibit I at para. 5).  Graffeo concluded that Fazzio was terminated because of

insubordination, primarily his refusal to use the correct method to calculate air emissions, and his

failure to coordinate tank landing procedures with operations staff.  She concluded that there was

nothing to suggest that Fazzio was terminated because of his age.  Rec. doc. 49 (Exhibit I at para.

5).  During a July 20, 2006 telephone call to Graffeo, Fazzio told her that he believed his termination

was the result of Toll and Kilkenny perceiving him to be resistant to change.  Rec. doc. 49 (Exhibit

G at 176).

Toll, Kilkenny and Seaman did not make any ageist remarks to Fazzio, nor did anyone with Environ.  Rec. doc. 49 (Exhibit G at 183).  To Fazzio's knowledge no one involved in the decision to terminate him ever made an ageist remark to him.  Rec. doc. 49 (Exhibit G at 200).

After Fazzio's termination, Chris Adams, a KMPG employee, was transferred to an air compliance manager position and he provided support to the region in which the Harvey and St. Gabriel facilities were located.  Adams was 27.  Rec. doc. 49 (Exhibit A at para. 9).  A contract employee, Dave Vensel, absorbed a number of Fazzio's former job duties.  Vensel was hired by KMPG on October 29, 2006.  He was 45.  Rec. doc. 49 (Exhibit A at para. 9).

KMPG's CORE team is a group of environmental health and safety employees who can assist with compliance issues at its terminal facilities.  Instead of being assigned to a particular facility, a member of the CORE team may perform duties at any facility.  Members of the CORE team perform the same types duties as they did when they were assigned to a particular facility. When an employee is assigned to the CORE team, there is no increase in salary, benefits or supervisory responsibilities.  Rec. doc. 49 (Exhibit A at para. 11).

<u>SUMMARY JUDGMENT STANDARD</u>

A party is entitled to summary judgment upon a showing that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2510 (1986);  <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1131 (5th Cir.), <u>cert. denied</u>, 113 S. Ct. 82 (1992);  Fed. R. Civ. P. 56(c).  In making its determination as to whether summary judgment is appropriate, the court must draw all justifiable inferences in favor of the non-moving party.  <u>Anderson</u>, 106 S. Ct. at 2513; <u>Oliver Resources PLC v. International Finance Corp.</u>, 62 F.3d 128, 130 (5th Cir. 1995).  To oppose a motion for summary judgment, the non-

movant cannot rest on mere allegations or denials but must set forth specific facts showing that there is a genuine issue of material fact.  Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552-53 (1986); Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc., 55 F.3d 181, 184 (5th Cir. 1995); Fed. R. Civ. P. 56(e).  A material fact is any fact "that might affect the outcome of the suit under the governing law."  Anderson, 106 S. Ct. at 2510.  If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case.  Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

## ANALYTIC FRAMEWORK

1.      Fazzio's *prima facie* case.

    In West v. Nabors Drilling USA, Inc., 330 F.3d 379 (5th Cir. 2003), the Fifth Circuit stated:

> Where, as here, there is no direct evidence of age discrimination, West must rely on the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  *See Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 & n. 3 (5th Cir.2000).  First, he is required to establish a prima facie case of discrimination.  *Id.* at 222.  In an age discrimination discharge case, "[t]he plaintiff must prove that:  1) he was discharged; 2) he was qualified for his position; 3) he was within the protected class; and 4) he was replaced by someone outside the protected class, someone younger, or was otherwise discharged because of his age." *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 654 (5th Cir.1996) (footnote omitted).

Id. at 384.  Fazzio has presented no direct evidence of age discrimination.

    KMPG contends that Fazzio cannot establish a *prima facie* case because he cannot demonstrate that: (1) he was qualified for the position he held; or (2) he was replaced by someone outside the protected class, replaced by someone younger, or otherwise discharged because of his age.  KMPG's argument that Fazzio was not qualified for the position turns on its contention that the audit demonstrated that he failed to perform his job as required.  This goes to the reasons for

KMPG's termination of Fazzio.  The question of whether there are material issues as to the truth of the reasons for KMPG's termination is considered below.  At this point in the analysis, it will be assumed that Fazzio was qualified for the position.

It is undisputed that Fazzio's responsbilities were divided between two persons: Chris Adams and Dave Vensel.  At the time of the audit, Adams was employed with KMPG as an air compliance manager and he was 27.  Vensel was an outside contractor, who was 45.  KMPG did not hire Vensel as a direct employee until some months after Fazzio's termination.  KMPG cites Martin v. Bayland Inc., 403 F.Supp.2d 578, 583 (S.D. Tex. 2005) ("When a terminated employee's job duties are distributed among other employees after termination, those employees do not replace the terminated employee.") (citations omitted).  Fazzio does not make a specific response; he simply contends that there is no question but that he can establish a *prima facie* case.  Rec. doc. 52 at 4.  It will be assumed that KMPG moved a younger employee, Adams, into Fazzio's position.  This satisfies the fourth element for the *prima facie* case, but weakly.

2.      KMPG's reasons for terminating Fazzio.

At the next step in the McDonnell Douglas framework, KMPG must produce evidence of a legitimate, nondiscriminatory reason for its decision to terminate his employment.  Its burden is only one of production, not persuasion, involving no credibility assessments.  West, 330 F.3d at 384-85.  The June 29, 2008 corrective action report presented several reasons for Fazzio's termination.  Rec. doc. 49 (Exhibit 1 to Exhibit A).   Each of these reasons provided a legitimate, nondiscriminatory reason for KMPG's decision to terminate Fazzio.

3.      Pretext for discrimination.

If the employer produces a legitimate nondiscriminatory reason for the termination, as has

been done by KMPG, the plaintiff bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the employer intentionally discriminated against the plaintiff because of age.  Laxton v. GAP, Inc., 333 F.3d 572, 578 (5th Cir. 2003).  The plaintiff must produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination.  Id. (citing Reeves v. Sanderson Plumbing Products, Inc, 530 U.S. 133, 142, 120 S.Ct. 2097, 2106 (2000)).  A plaintiff may establish pretext by demonstrating that the employer's proffered explanation is false or unworthy of credence.  Reeves, 120 S.Ct. at 2106.  Such evidence, taken together with the plaintiff's *prima facie* case, is likely to support an inference of discrimination even without further evidence of defendant's true motive.  Laxton, 333 F.3d at 578.

The plaintiff must rebut each nondiscriminatory reason articulated by the employer.  Id.  On this motion for summary judgment, Fazzio must set forth specific facts showing that there is a genuine issue of material fact as to the falsity of each of the reasons offered by KMPG for his termination.[1]

     a.      The Ferry methodology.

The corrective action report stated that:

> You have incorrectly calculated emission rates for the Harvey and St. Gabriel Terminals, significantly understating actual emission volumes and submitted the incorrect reports to the state.

Rec. doc. 49 (Exhibit 1 to Exhibit A).  The report added that, "[c]onsidering your resistance to changing emission calculation and reporting, . . . [and] the necessity to deny you the ability to submit

---

[1]  In Laxton, the plaintiff appealed an order by the district court granting judgment as a matter of law.  333 F.3d at 574.  In Reeves, the Fifth Circuit reversed a judgment for the plaintiff and held that the plaintiff had not introduced sufficient evidence to sustain the jury's finding of unlawful discrimination.  120 S.Ct. at 2104.  "[T]he standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same."  Reeves, 120 S.Ct. at 2110 (citations and quotation marks omitted).

air emission reports without review and clearance by others . . . we have determined to terminate your employment effective immediately." Id.

In opposition to the motion for summary judgment, Fazzio cites: (1) notes taken by Dalton during his interview of Ray Blancher; (2) Toll's April 13, 2006 e-mail; (3) an affidavit of Dr. Hassan Ghosn of DEQ; and (4) an affidavit from Mr. Syed Quadri of DEQ. Rec. doc. 52 (Exhibits 1-4). Quadri knew Fazzio only when he was employed by IMTT from 1992 through 1999. This is not relevant to what occurred in 2006. The affidavit from Dr. Ghosn is not relevant. While it relates to Fazzio's relationship with Dr. Ghosn and perhaps others at DEQ during his employment with KMPG, it is not relevant to the results of the audit and what occurred between Fazzio and others within KMPG after the audit.

When Seaman requested that Fazzio be terminated, Dalton was assigned by KMPG's human resources department to conduct an investigation. Dalton interviewed Blancher, a regional environmental manager, and made notes of that interview. These notes include the following:

> After the March 2006 Audit, Fazzio prepared and submitted a report to the state. He subsequently went to Blancher and reported that he had made errors in the report, and he presented a corrected report to Blancher. He asked if he should send the corrected report to the state.
>
> Blancher instructed him to contact Jessica Toll, a company attorney, for advice.
>
> Blancher said that he didn't remember the nature of the error, but he assumed that Fazzio had used the formula to calculate emissions that he'd been using before the audit and had realized that the Environ formula should have been used and had corrected the report.
>
> *   *   *
>
> Fazzio's prior formula was from Tanks 4.0 a program to calculate tank emissions and landing losses. A computer does the calculation.
>
> He is not aware of Fazzio resisting use of the Environ formula. As far as he knows,

11

Fazzio is using the Environ formula now.

Fazzio thinks the formula that he has been using is legally acceptable and should be used, but if KM has determined to use the Environ formula, he will use it.

He is not aware of any situations since May 1 in which Fazzio has used an unacceptable formula or caused any error.

Rec. doc. 52 (Exhibit 1).  With doubts resolved in favor of Fazzio and inferences drawn in his favor, the notes on the Blancher interview demonstrate that: (a) prior to the audit, Fazzio used a formula which he believed was legally acceptable, (b) after the audit, he erred in not using the Ferry methodology on one occasion; (c) Blancher was not aware of Fazzio resisting the use of the Ferry methodology; and (d) since May 1, 2006 Blancher believed that Fazzio used the Ferry methodology. The notes, however, do not reflect what Fazzio was saying to Toll or others.  Dalton concluded that:

> [E]ven if Fazzio had not known that the Ferry method was the proper formula to use before the March 2006 audit, he certainly knew from the explicit instructions he received after the audit that Kinder Morgan mandated use of the Ferry method. Despite instructions he was given, Fazzio refused to use the Ferry formula.

Rec. doc. 49 (Exhibit F at para. 7).

Fazzio acknowledged that he was opposed to the use of the Ferry methodology and resisted the change to it.  Rec. doc. 49 (Exhibit G at 160 and 163).  He admitted that he left a voice mail for Toll where he reported that he was going to continue using the old calculation unless she told him otherwise.  Rec. doc. 49 (Exhibit G at 164).  He admitted that after the audit he was required to submit emission reports generated by him to Toll for review before they were submitted to DEQ. Rec. doc. 49 (Exhibit A at para. 5 and Exhibit G at 199).  The corrective action report concluded, in part, that Fazzio was resistant to changing the emission calculations and that it was necessary to deny him the ability to submit air emission reports without review and clearance by others.  Fazzio

has not raised a material issue of fact as to the truth of these conclusions.[2]

       b.      <u>The temporary (variance) permit for Tank 2000-1.</u>

The corrective action report stated that:

> You failed to properly permit tank 2000-1 and allowed the permit variance of the change in tank service to expire, leaving the tank unpermitted.

Rec. doc. 49 (Exhibit 1 to Exhibit A).  It is undisputed that: (a) a temporary permit was secured from DEQ for Tank 2000-1 so it could be used to store natural gas; (b) the permit expired; and (c) natural gas was stored in the tank after the permit expired.

Fazzio acknowledged that KMPG considered it his responsibility to maintain the variance permit.  Rec. doc. 53 (Exhibit 5 at 193-94).  He denied, however, that it was his responsibility to monitor the product in the storage tanks or to make sure that the variance permit did not expire without either a renewal or change of tank service permit.  Rec. doc. 49 (Exhibit G at 74 and 192).  The evidence submitted by Fazzio with his opposition does not respond to the question of his responsibility for allowing the variance permit to expire.  Dalton's notes of the Blancher interview are silent on this issue.  Dr. Ghosn does not address the issue.  To oppose a motion for summary judgment, the non-movant cannot rest on mere allegations or denials but must set forth specific facts showing that there is a genuine issue of material fact.  <u>Celotex</u>, 106 S. Ct. at 2552-53.  Fazzio has not presented specific facts which demonstrate that there is an issue regarding his responsibility for allowing the permit for Tank 2000-1 to expire.

---

[2] It is noteworthy that KMPG was not trying to have Fazzio use a formula that could be characterized as aggressive or that it was attempting to minimize emissions reported to the DEQ. To the contrary, all agree that the Ferry methodology was more conservative than the formula which Fazzio was using. Yet Fazzio resisted the use of the Ferry methodology.

c.      The landing of the roof for Tank 2000-1.

The corrective action report stated that:

> Tank 2000-1 would often be drained to a point where the internal floating roof would not be in contact with the liquid material for several months, recently natural gasoline, which resulted in a higher volume of vapors than would have occurred if the roof had not "landed", and which you did not take into consideration in calculating and reporting emissions.

> \*   \*   \*

> During the post audit meeting and discussions at the Harvey Terminal, you and other employees, were orally instructed that under no circumstances was the internal floating roof in tank 2000-1 to be landed.  You also received written instructions on April 13, 2005 from Jessica Toll, reminding you that the floating roof was not to be landed. . .  On April 24 or 25, the roof in tank 2000-1 was landed. . . .

Rec. doc. 49 (Exhibit 1 to Exhibit A).  The report added that, "[c]onsidering . . . your lack of follow-up action to insure that floating roof was not allowed to land . . . we have determined to terminate your employment effective immediately."  Id.

It is undisputed that: (a) if the internal floating roof is allowed to land, the control mechanism is lost and the vapors escape rapidly when the tank is refilled; (b) Fazzio was told that the roof for Tank 2000-1 could not be landed; and (c) it did land.

Fazzio's response is that it was out of his control.  Rec. doc. 49 (Exhibit G at 197).  Dalton's notes of the Blancher interview contain the following:

> In the tank landing incident, Fazzio should not be singled out for blame.  Operations managers as well as Fazzio and Blancher were present when the basic communication about not landing a tank was given.  Blancher considers himself more responsible for the tank landing of tank 2000-1.

Rec. doc. 53 (Exhibit 1).  This does not raise a material issue as to the truth of KMPG's reason for terminating Fazzio.   Blancher's only dispute is whether Fazzio, as the project manager for environmental, health and safety for the terminal facility at Harvery and the recipient of oral and

14

written instructions to avoid landing the roof of Tank 2000-1, should bear responsibility for its occurrence, when others were given the same instruction. Blancher does not contend that there was nothing that Fazzio could do to prevent the roof from landing.

4.      The presentation of pretext is insufficient.

Fazzio has not presented evidence from which a factfinder could conclude that each of the reasons presented by KMPG for his termination is false. He has not established that the reasons are a pretext for discrimination. KMPG is entitled to summary judgment on Fazzio's ADEA claim. Price v. Federal Express Corp. 283 F.3d 715, 722-23 (5th Cir. 2002).

Assuming *arguendo* that Fazzio created a fact issue on one or more of KMPG's reasons for terminating him, it would be at its best a very weak issue of fact. In addition, at least one element of his *prima facie* case is not strong since it is based on an assumption by the undersigned. In Reeves, the Supreme Court stated:

> [T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . .
>
> *      *      *
>
> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

106 S.Ct. at 2109. In Laxton, such instances were described as "rare." 333 F.3d at 579.

Fazzio presented no evidence of any ageist comments by anyone employed by KMPG or the

consultant, Environ, who participated in the audit.  There is no evidence that KMPG singled out Fazzio for an audit.  The decision to terminate Fazzio did not rest only with Seaman.  KPMG's human resources department concurred in the decision.   The person assigned to make the investigation, Dalton, was 60.  There is abundant and uncontroverted independent evidence that discrimination did not occur.  Assuming there was an issue of fact as to each of KMPG's reasons for his termination, Fazzio's demonstration of pretext is completely insufficient to establish discrimination.

5.      Failure to promote.

        In his amended complaint, Fazzio alleged that he was discriminated against and passed over for a promotion from March 6, 2006 to June 29, 2006.  Rec. doc. 23 at 4.  In his deposition, he referred to a discussion in 2005 with a KMPG employee about a position on the CORE team.  Rec. doc. 49 (Exhibit G at 57-58).  KPMG moved for summary judgment on the failure to promote claim. Rec. doc. 49 at 16-18.  It demonstrated that an assignment to the CORE team is not a promotion. Rec. doc. 49 (Exhibit A at para. 11).  Fazzio did not oppose the motion for summary judgment on the failure to promote claim.  It will be granted.

6.      State law claims.

        Louisiana employment discrimination law follows the federal precedent, and therefore the same analysis applies to Fazzio's claim under La. Rev. Stat. Ann. § 23:311, Louisiana's age discrimination statute.  Steib v. LaStrada Inn. Inc., 1993 WL 8302, at *7 (E.D. La.) (J. Sear).  This is not disputed by Fazzio.  Inasmuch as Fazzio's ADEA claim fails, his state law claim must fail as well.

IT IS ORDERED that KMPG's motion for summary judgment (Rec. doc. 49) is GRANTED.

New Orleans, Louisiana, this 6th day of November, 2008.

**SALLY SHUSHAN**
**United States Magistrate Judge**